UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY CINTRON, <br><br> Plaintiff, <br><br> v. <br><br> JETBLUE AIRWAYS CORPORATION, <br><br> Defendant. | Civil Action No. <br> 18-10356-FDS |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION TO DISMISS**

**SAYLOR, J.**

This is a lawsuit arising out of the removal of a passenger from an airplane before takeoff. Plaintiff Jenny Cintron, who is proceeding *pro se*, filed this suit against defendant JetBlue Airways Corporation. Cintron has hearing and vision impairments due a brain tumor and subsequent surgery. She was removed from a JetBlue flight after she did not hear the flight attendant's safety instructions and then touched his back to get his attention. According to Cintron, without listening to her explanation, the flight attendant complained to the captain, and she was removed from the aircraft. She was rebooked on a JetBlue flight at no extra cost the next day, but she alleges that she was humiliated and suffered emotional distress.

The amended complaint does not identify specific legal claims, but appears to assert a claim of intentional infliction of emotional distress.

JetBlue has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. For the following reasons, the motion to dismiss will be granted.

I.      **Background**

Because Cintron is proceeding *pro se*, the Court will construe her pleadings liberally. The following facts are taken from her complaint, her amended complaint, and her memorandum in opposition to the motion to dismiss.

   A.      **Factual Background**

Jenny Cintron is a 57-year-old woman who lives in Lynn, Massachusetts. She is originally from Puerto Rico and is a native Spanish speaker.

In 2014, she developed a brain tumor that was surgically removed. The tumor and the surgery caused her to become partially disabled. (Am. Compl. at 1). She suffers from a total loss of hearing in her right ear and a 40% loss in her left ear. (*Id.*). She also suffers a vision impairment. (*Id.*).

Following her illness, Cintron went into early retirement and left her position as a Director of Action for Boston Community Development, Inc., where she had been working for almost 29 years. (Pl. Opp. to Mot. to Dismiss at 5). In the aftermath of her illness and recovery, she "had to learn[] how to do everything all over again as [she] was a baby," and depended on her family for help. (*Id.* at 4, 6). She suffered from depression due to her sudden disability. (*Id.* at 6). She alleges that she had difficulty recovering from the loss of her career and struggled to find her identity and purpose again after her illness. (*Id.*). She underwent months of psychotherapy sessions and medical treatment. (*Id.*).

JetBlue Airways Corporation is a commercial air carrier. On December 28, 2016, Cintron boarded a JetBlue flight from Boston to San Juan, Puerto Rico, where she was going to visit some relatives for the first time following her illness. (Am. Compl. at 1). Cintron and her family were seated in the aircraft emergency exit row. (Pl. Opp. to Mot. to Dismiss Ex. 1). After boarding, she sat down in the middle seat, settled in for the flight, fastened her seatbelt, and

started looking at her phone. (Am. Compl. at 1-2).

Because of her hearing impairment and the noise on the aircraft, Cintron did not notice when the flight attendant started talking to her and her family about safety regulations for sitting in an exit row. (*Id.*). Her uncle, who was sitting next to her on the aisle side, touched her to get her attention, and realizing that the flight attendant was talking to her, she stood up and turned her head to listen with her left ear. (Compl. at 1; Am. Compl. at 2). At that moment, the flight attendant told her, allegedly in a rude voice, "Pay attention, I am talking with you, are you deaf?" He walked away before she could answer. (Am. Compl. at 2).

Cintron immediately got up to explain the situation to the flight attendant. (*Id.*). As he was walking away, she touched his back to get his attention because she did not know his name, and asked him why he had spoken to her in that manner. (Compl. at 1-2; Am. Compl. at 2). However, the flight attendant kept walking without giving her a chance to say more, so she went back to her seat and started crying. (Am. Compl. at 2).

Cintron's family helped her calm down, and she had composed herself when a second flight attendant came over and asked her to come to the front of the aircraft. (*Id.*). Two police officers were waiting with the captain to escort her off the plane. (*Id.* at 2, 4). She tried to explain that there was a misunderstanding due to her disability, and offered to apologize to the flight attendant, but the captain said that the flight attendant did not like that she had touched him. (*Id.* at 4). After the two police officers escorted her off the aircraft with her husband, she spoke with an airline supervisor, who appeared more sympathetic to her situation, but explained that she did not have the authority to go against the captain's decision. (*Id.*). Cintron was rebooked at no extra cost for a flight the next day, and was offered a taxi voucher. (*Id.*).

That night, according to Cintron, she had a nervous breakdown caused by the humiliation

of being escorted off the plane combined with the distress that she had been experiencing during her recovery from the brain tumor. (Am. Compl. at 4; Pl.'s Opp. to Mot. to Dismiss at 7). She overmedicated herself with sleeping pills, and was sick and bedridden for the following three days after landing in Puerto Rico. (Am. Compl. at 4-5; Pl.'s Opp. to Mot. to Dismiss at 7).

On January 4, 2017, Cintron received an e-mail from JetBlue apologizing for what they called a lapse in customer service. (Pl. Opp. to Mot. to Dismiss Ex. 1).

After the incident, Cintron had to increase her therapy sessions and her medications again due to the emotional distress she experienced, and she still has nightmares about the event. (Pl.'s Opp. to Mot. to Dismiss at 7-8).

### B.    Procedural Background

On January 26, 2017, Cintron filed a complaint against JetBlue in the Superior Court of Suffolk County, Massachusetts, claiming egregious conduct, physical and mental harm, intentional infliction of emotional distress, and emotional trauma. (Compl. at 3).[1]  She initially served JetBlue at the wrong address, and on January 24, 2018, she filed a request to extend the deadline to complete service. (*See* State Ct. Rec. Dkt. No. 6). The same day, she filed an amended complaint. (Am. Compl. 1-5).

On February 24, 2018, JetBlue removed the proceeding to federal court, pursuant to 28 U.S.C. § 1441. This Court has diversity jurisdiction under 28 U.S.C. § 1332 because plaintiff is a citizen and resident of Massachusetts, defendant is a Delaware corporation with a principal place of business in New York, and the amount in controversy is $300,000, according to

---

[1] The civil cover sheet categorized the complaint as a violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H, 11I, but the complaint otherwise does not appear to identify a claim under that statute. (Compl. at 3).

plaintiff's statement of damages.[2]

JetBlue has moved to dismiss the complaint for failure to state a claim on which relief can be granted.

## II.     Standard of Review

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a defendant's motion to dismiss, a plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

---

[2] Defendant contended in its notice of removal that there was federal-question jurisdiction under 28 U.S.C. § 1331 because the complaint could be read to assert claims under the Air Carrier Access Act of 1986, 49 U.S.C. § 41705, and the Airline Deregulation Act of 1978, 49 U.S.C. §§ 41713, 44902(b). However, there appears to be no private right of action under the Air Carrier Access Act. *See* 49 U.S.C. § 41705(c) (providing that the Secretary of the Department of Transportation should investigate complaints). And the provisions of the Airline Deregulation Act that JetBlue cites appear to be defenses, not causes of action. *See* Wright & Miller, 13D FEDERAL PRACTICE & PROCEDURE § 3566 (2018 update) (explaining that the well-pleaded complaint rule "bars invoking jurisdiction on the basis of a federal defense raised by the defendant's answer").

### III.     Analysis

#### A.     Airline Deregulation Act Preemption

JetBlue contends that any Massachusetts common-law claim for intentional infliction of emotional distress is explicitly preempted by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713. That statute provides in part as follows: "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1). Congress included the preemption provision "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). However, state laws are not pre-empted if the connection to "price, route, or service" is "too tenuous, remote, or peripheral . . . to have pre-emptive effect." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 224 (1995) (alteration in original) (quoting *Morales*, 504 U.S. at 390) (internal quotation marks omitted).

In the present case, JetBlue contends that the ADA preempts state-law claims arising from (1) its employees' alleged mistreatment of Cintron and (2) her removal from the aircraft. The "ADA preemption analysis breaks down into two sub-questions: whether the claim is based on a state 'law, regulation, or other provision having the force and effect of law,' (the 'mechanism' question), and whether the claim is sufficiently 'related to a price, route, or service of an air carrier' (the 'linkage' question)." *Bower v. EgyptAir Airlines Co.*, 731 F.3d 85, 93 (1st Cir. 2013) (quoting *Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st Cir. 2013)). Cintron's common-law claim of intentional infliction of emotional distress is encompassed by the Supreme Court's definition of "law" and "regulation." *See Brown*, 720 F.3d at 64-66. The claims obviously do not involve a "price" or a "route." Thus, the question is whether those claims are sufficiently "related to" a "service" within the meaning of the ADA.

The ADA does not provide a definition of "service," and neither the Supreme Court nor the First Circuit has explicitly defined the scope of activities covered by the term. Furthermore, various Courts of Appeals have disagreed on the meaning of "service" under the statute, and to what extent the preemption provision covers common-law tort claims. The Ninth Circuit adopted a narrow construction in *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (1998) (en banc), holding that the term "service" encompasses "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail," but not the "provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." *Id.* at 1261; *see also Duncan v. Northwest Airlines, Inc.*, 208 F.3d 1112, 1114-15 (9th Cir. 2000) (quoting *Charas*, 160 F.3d at 1265-66). The Third Circuit has followed the Ninth Circuit, and further explained that "the continued existence of statutorily mandated liability insurance coverage is strong evidence that Congress did not intend to preempt state tort claims." *Taj Mahal Travel, Inc. v. Delta Airlines Inc.*, 164 F.3d 186, 194 (3d Cir. 1998).

By contrast, the Fifth Circuit in *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334 (5th Cir. 1995) (en banc), defined "service" as the "[contractual] features of air transportation," comprising "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself." 44 F.3d at 336 (alteration in original) (quoting the panel's opinion in *Hodges v. Delta Airlines, Inc.*, 4 F.3d 350, 354 (5th Cir. 1993)). But it made a distinction between contract and tort claims, explaining that "federal preemption of state laws, even certain common law actions, 'related to services' of an air carrier, does not displace state tort actions for personal physical injuries or property damage caused by the operation and maintenance of an aircraft." *Id.* at 337. The Seventh and Eleventh Circuits follow that approach. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433

(7th Cir. 1996); *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1256-57 (11th Cir. 2003).  The Second Circuit's definition, while narrower than the *Hodges* rule, rejected the narrow definition from *Charas*.  *Air Transport Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008) (holding that the provision of amenities during a lengthy ground stay was a "service" under § 41713(b)(1)).  The Fourth Circuit has taken a similar middle-ground approach in *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) (holding that "boarding procedures are a service rendered by an airline").  And it acknowledged that, to the extent a plaintiff's tort claims are based on conduct separate from the refusal to transport, they are not preempted.  *Id.* at 259.

In *Bower*, the First Circuit declined to follow the *Charas* approach, and instead adopted the *Hodges* definition of "service."  *Bower*, 731 F.3d at 94.  In that case, the plaintiff sued an airline for intentional interference with his custodial rights, negligence, negligent infliction of emotional distress, and loss of filial consortium when the airline allowed his children to board a flight to Egypt with suspicious paperwork in the care of their mother, who was not their legal guardian.  *Id.* at 88-89.  The First Circuit stated that "[w]hether the airline is allowing a passenger onto the plane or preventing a passenger from boarding, that determination takes place during the company's ticketing, check-in and boarding procedures" and "conclude[d] that the ticketing, check-in and boarding procedures at issue [in that case] constitute a 'service' for the purposes of the ADA in accordance with our broader view of the term 'service.'"  *Id.* at 95.  The *Bower* court noted that the district court had viewed the plaintiff's state-law claims as being "similar to personal injury tort claims, which nearly all courts agree are not preempted by the ADA."  *Id.*  Although the First Circuit acknowledged that "personal injury claims are generally not preempted by the ADA," it held that the negligence claims the plaintiff was trying to assert in that case were preempted because (1)  no bodily injury was alleged, and (2) allowing liability

would "impos[e] a fundamentally new set of obligations on airlines under the rubric of 'duty of care.'" *Id.* at 96.  The court worried that recognizing such a duty "would be exactly what *Rowe* and *Morales* warn against:  a 'patchwork' of state regulations that effectively frustrate Congress's purpose in deregulating the airlines." *Id.* at 97 (citing *Rowe v. N.H. Motor Transp.t Ass'n,* 552 U.S. 364, 373 (2008); *Morales,* 504 U.S. at 378-79)).

In this case, Cintron was already on board the aircraft.  However, the incident took place during the explanation of safety requirements for passengers seated in an exit row, prior to leaving the gate, and her removal was directly related to a flight attendant's attempt to explain those requirements.  The incident therefore appears to arise out of a "boarding procedure," which falls under the broad definition of "service" as expressed in *Bower*.  Although her claim for intentional infliction of emotional distress is similar to a personal-injury claim, which generally would not be preempted, her distress arises from the determination of the flight attendant, and then of the captain, that she was a safety risk.  *See Smith*, 134 F.3d at 259 (holding that claims for false imprisonment and intentional infliction of emotional distress were only preempted to the extent they were premised on defendant's refusal to permit him to board his flight, but that if "an airline held a passenger without a safety or security justification, a claim based on such actions would not related to any legitimate service and would not be preempted"); *Gill v. JetBlue Airways Corp.*, 836 F. Supp. 2d 33, 42 (D. Mass. 2011) (citing cases holding that IIED claims are "related to" airline "services" and are therefore preempted).  Furthermore, and as noted below, airlines are expressly entitled to refuse boarding to a passenger it determines to be "inimical to safety."  49 U.S.C. § 44902(b).  To allow a state-law claim based on the flight attendant's behavior to go forward under the circumstances would create the type of situation that Congress was attempting to prevent by deregulating airlines—a patchwork of additional

state restrictions on boarding decisions that are governed by federal law.  *See Bower*, 731 F.3d at 97-98.  Accordingly, Cintron's state-law claim is preempted by the ADA.

      **B.**      <u>**49 U.S.C. § 44902(b) "Permissive Refusal"**</u>

Even if her claim were not preempted, JetBlue may be immunized from liability under 49 U.S.C. § 44902(b).  *Cerqueira v. Am. Airlines, Inc.*, 520 F.3d 1, 14 (1st Cir. 2008).  That subsection, titled "Permissive Refusal," provides as follows:  "Subject to regulations of the Under Secretary, an air carrier, interstate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."  49 U.S.C. § 44902(b).  What constitutes behavior "inimical to safety" is not defined by the statute; however, courts have generally granted broad discretion to the airline when making that determination.  *Cerqueira,* 520 F.3d at 12.  The authorization extends to situations in which a passenger or property "might be" inimical to safety, and the airline is not required to make a complete or accurate factual investigation before making a decision.  *Id.* at 12, 15.

The determination of whether a passenger or property is inimical to safety is made by the captain, who is the final authority as to the operation of the aircraft and stands in the role of the air carrier for a decision to remove a passenger from a flight.  *Cerqueira*, 520 F.3d at 12-14.  Moreover, "there is no obligation on the part of the Captain . . . to make a thorough inquiry into the information received, the sources of that information, or to engage in an investigation.  The Captain . . . is entitled to accept at face value the representations made to him by other air carrier employees."  *Id.* at 15 (citation omitted); *see Xiaoyun Lucy Lu v. AirTran Airways, Inc.*, 631 F. App'x 657, 661 (11th Cir. 2015) (citing *Cordero v. Cia Mexicana De Aviacion, S.A.,* 681 F.2d 669, 672 (9th Cir. 1982); *Christel v. AMR Corp.*, 222 F. Supp. 2d 335 (E.D.N.Y. 2002)).

In the First Circuit, the standard of liability for permissive refusal is that articulated by the Second Circuit in *Williams v. Trans World Airlines*, 509 F.2d 942 (2nd Cir. 1975).  That

standard aims to balance the primary interest of aircraft safety with other concerns, such as prohibitions against discrimination. *Cerqueira*, 520 F.3d at 14. Airlines may not be subject to liability for removing a passenger from an aircraft unless the decision was arbitrary or capricious. *Id.* The review of the decision to refuse transport is limited to what was actually known by the captain at the time of the decision, and not what the captain reasonably should have known. *Id.* at 14-15. "The biases of a non-decisionmaker may not be attributed to the decisionmakers," and "the pilot 'is entitled to rely on the information provided to him by his crew despite any exaggerations or false representations.'" *Id.* at 15 (quoting *Al–Qudhai'een v. Am. W. Airlines, Inc.*, 267 F. Supp. 2d 841, 848 (S.D. Ohio 2003)). Therefore, even mistaken decisions are protected, as long as they are not arbitrary or capricious. *Id.*

Furthermore, because 49 U.S.C. § 44902(b) confers an affirmative privilege to the airline, Cintron bears the burden to show that the statute does not apply. *Xiaoyun*, 631 F. App'x at 661; *Cerqueira,* 520 F.3d at 13-14. Here, she alleges that she never presented a safety concern, that there had been a misunderstanding, and that the flight attendant abused his authority to embarrass and humiliate her, without reporting the true story to the captain. (Am. Compl. 2, 4). But she also alleges that she tapped the flight attendant on the back, and that the captain told her that the reason he decided to remove her was that the flight attendant had not liked that. (Am. Compl. at 2, 4).

Even viewing the facts in the light most favorable to Cintron, she cannot establish that the airline's decision to remove her was arbitrary and capricious. Even though the flight attendant's conduct may have been callous and unprofessional, and even though he may have exaggerated or misrepresented facts to the captain, the captain was allowed under the statute to take the flight attendant's words at face value. Although perhaps some basic decency and patience might have

11

cleared up the misunderstanding, the extreme deference given to the captain by law effectively ties the Court's hands.  In short, the Court cannot conclude that the captain's decision to remove her, even if it was unwise or unfair, was so arbitrary or capricious as to subject the airline to liability.

Accordingly, the complaint must be dismissed for failure to state a claim.

**IV.** **Conclusion**

For the foregoing reasons, defendant's motion to dismiss is GRANTED.  Plaintiff's motion to appoint counsel is DENIED as moot.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor, IV
Dated:  August 15, 2018                             United States District Judge